

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2002 MAY 29 P 4: 48

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **ELLIS McCLELLAN** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NUMBER: 00-0342** |
| | * | |
| **HOEGH LINES** | * | **SECTION: "C"** |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * * | | **MAGISTRATE: (4)** |

## MEMORANDUM IN OPPOSITION TO MOTION IN LIMINE

**MAY IT PLEASE THE COURT:**

Defendant has filed a motion in limine to exclude the testimony of Marine Expert George Duffy and Vocational Expert Cornelius Gorman. Defendant's motion should be denied. Not only is defendant wrongly relying on *Daubert* as the basis for the motion in limine, but the testimony of both experts is reliable and easily meets the requirements of Federal Rule of Evidence 702.

The fact that an expert's opinion may contain arguable shortcomings does not necessitate the expert's exclusion from testifying at trial. The Supreme Court has stressed that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the ...appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). In this case, the testimony of both Duffy and Gorman do not even come close to the level of "shaky but admissible evidence."





## DUFFY

First, defendant does not complain that Mr. Duffy is not competent by training, experience or education to qualify as an expert in marine safety. Defendant complains that Mr. Duffy's testimony should be excluded because conclusions in his report are issues a jury can weigh without specific technical knowledge or experience, or are purported conclusions of law.

Defendant has not yet taken the deposition of Mr. Duffy. Rather, defendant would rather argue Mr. Duffy makes a statement without very detailed reasons for the statement, and since those detailed reasons, which are based upon actual experience, knowledge and training, are not contained within the report, therefore Mr. Duffy's testimony should be excluded. This rational and thought process and analysis is defective. Thus, the creation of *Daubert* hearings has developed. Of course, the discovery technique known as depositions is probably the most common, but defendant has not yet taken the deposition of either Mr. Duffy or Gorman. Accordingly, plaintiff counsel hereby requests that a *Daubert* hearing be held, or at the very least, depositions be taken of both Duffy and Gorman, with the relevant excepts being supplied to the court. Gorman's deposition is scheduled for May 30th, and dates for Duffy in early June have been supplied to defendant.

A jury certainly is not knowledgeable about stevedoring and vessel operations and the customary practices and obligations between stevedores and vessel operations in settings such as the accident and case involved herein. As a matter of fact, if there is an area of the law that is more unique than any other, it is the maritime law in a stevedore/vessel operations' setting.

When Mr. Duffy uses the words "not open and obvious" there is plenty of underlying testimony that is not expressed in the report that supports that conclusion. For instance, Mr. Duffy might explain that the inside of crane pedestals are not normally included on a pre-stevedoring

2

operation inspection. Mr. Duffy might explain that in his experience the ship's crew does not inspect

inside the crane's pedestal with a representative of the stevedore. Mr. Duffy might explain that the

crane certification forms for periodic inspections do not reference or normally include mention of

hydraulic oil leaks. Mr. Duffy might explain the colorless nature of hydraulic oil. Mr. Duffy might

explain or opine that hydraulic oil of a ship's crane would leak usually during operation of the crane

due to the mechanical operations of the crane itself. Mr. Duffy might opine that hydraulic oil leaking

from a ship's crane in operation might not impact the actual functioning or operation of the crane.

Mr. Duffy might testify to the customary duties of the ship's crew with respect to the ship's cranes

prior to stevedoring activity occurring that could provide a basis for believing or concluding that a

ship's crane would not and should not be leaking hydraulic oil. This Honorable Court is the "gate-

keeper" on expert testimony being allowed to go to a jury. There is nothing difficult or burdensome

about Mr. Duffy testifying at trial, and his testimony being curtailed and controlled appropriately to

assist the jury in reaching its decision. That job is for the attorneys and the court. But to exclude

testimony before anyone knows exactly and succinctly what is going to be opined by an expert is not

the best avenue of attack. It could potentially result in unfairness to a party and the expert whose

testimony is sought to be excluded.

Mr. Duffy's statement that only the stevedore crane operator enters the crane pedestal is next

on defendant's list of complaints. I cannot imagine that Mr. Duffy just made this statement without

some reasonable explanation or basis, relying on his experience and knowledge in the industry.

Attached as Exhibit "A" is the curriculum vitae of Mr. Duffy. His curriculum vitae illustrates many

3

years of experience in the cargo/stevedoring/ship board operations industry. Again, the testimony of Mr. Duffy should be heard by the Court, either live and/or by deposition, before excluding his testimony without a sufficient basis to do so.

The next statement complained of by defendant is that "it is the responsibility of the vessel crew to properly turn over the vessel and its' cranes to the stevedore. They must insure all vessel equipment is in good working order and that it is continually checked during the stevedore operations to ensure the safety of the longshore personnel." Defendant complains that Mr. Duffy is instructing the jury on the law. Well, Mr. Duffy might be expressing customary practices based upon his years of experience and training. While defendant argues Mr. Duffy wrongly states the law, maybe Mr. Duffy is expressing a slight nuance or variance to the law of *Scindia* based upon "customary" practices in the industry. Mr. Duffy might be of the opinion that the inside of crane pedestals, like the inside of a ship's wheelhouse, during stevedore operations are not areas of the ship customarily "turned-over" to the stevedore. Without hearing Mr. Duffy's testimony, again exclusion of Mr. Duffy from testifying could be unfair and unreasonable.

The next opinion complained of by defendant is "prior to arrival at the berth it is normal procedure for the vessel crew to start the vessel cranes and check to ensure they are in good operating condition. They should also check for any hydraulic leaks and any oil that may have leaked in all areas of the cranes and vessel deck area. The vessel crew should perform routine maintenance check to ensure that during the use of this equipment that it continues to perform in good working order. They should routinely monitor for any oil leaks that may occur. If a leak or spill is discovered it is the vessel crews responsibility to immediately clean up the spill to ensure that all the oil is removed and that no safety hazzard remains."

4

In this case, following the accident, a photo was taken in the crane pedestal. The photo shows a bag which contained "oily" rags. Also, one rag is outside the bag on the deck. Mr. McClellan was the first crane operator to operate this crane in stevedore operations. The bag of oily rages were either present before stevedore operations began or were placed in the pedestal after stevedore operations began. Mr. Duffy might explain to the jury that stevedore/longshoremen do not normally or ever clean up hydraulic oil-leaking ship's cranes, leading the jury to believe that the ship's crew is responsible for the bag of oily rags that just so happened to have been in a crane's pedestal wherein Mr. McClellan slipped in hydraulic oil. If the leaks occurred prior to turning the ship over to the stevedore, Mr. Duffy might testify that the ship's crew apparently failed to adequately clean up the pedestal of the crane in which Mr. McClellan slipped and fell. If the leaks occurred during operation of the crane by Mr. McClellan, and the ship's crew cleaned up during Mr. McClellan's tour of duty running the crane, then Mr. Duffy might testify the crew undertook an obligation and failed to fulfill the duty properly. He might also testify that the pedestal is not an area typically under the control of a stevedore, like a ship's hold is. He might also testify that the ship's crew, once attempting to clean up leaked hydraulic oil, should have alarmed someone from the stevedore so Mr. McClellan would be safe. Mr. Duffy's testimony would assist the jury and should not be stricken. Defendant's motion makes the assumption that since the law is the law and it expresses a party's duties and obligations, then experts are never needed. Such a position is foolish.

The next complaint by defendant is concerning the "visibility" of hydraulic oil. Defendant complains that Mr. Duffy is not an expert on "visibility." Defendant is now being absurd and

childish. Not every lay person knows hydraulic oil is clear. Not every lay person knows that a crane pedestal is a very enclosed space which with the typical lighting makes hydraulic oil even more difficult to see. Mr. Duffy can assist which these issues for the jury as well.

Mr. Duffy is supposed to make a conclusion about the ship's actions in this case. In this case he concludes the ship failed to meet its obligations to Mr. McClellan. Defendant blindly files a motion in limine without deposing Mr. Duffy. Mr. Duffy shall testify as to the customary practices of vessel operations based upon his experience as both a stevedore and ship's operations personnel. Mr. Duffy shall testify to the nature of hydraulic oil and its differences from typical oil, such as one that is colored or black. Mr. Duffy shall testify to appropriate inspection procedures of a ship's crew. Mr. Duffy shall testify to appropriate clean-up procedures for a crane hydraulic oil leak. Mr. Duffy shall testify as to appropriate warning obligations when a hydraulic oil leak occurs and is discovered by a ship's crew. Mr. Duffy might testify the ship's pedestal crane is not customarily turned over to the stevedore. Mr. Duffy might testify the stevedore does not clean up the ship's cranes or maintain ship's equipment. The point is Mr. Duffy's testimony is not excludable and shall assist the trier of fact.

## GORMAN

Dr. Gorman is a vocational rehabilitation expert and shall not testify to medical causation. Such a statement by defendant is ridiculous. Counsel for plaintiff, this Court and defense counsel know better than to ask or allow to ask a medical causation question of Dr. Gorman. Dr. Gorman shall testify that based upon the injury suffered by Mr. McClellan that it is unlikely, given his age, work history and restrictions as to work, that Mr. McClellan would successfully be employed in any capacity.

Dr. Gorman certainly is allowed to express his understanding of Mr. McClellan's history gained through an interview upon which he relies to reach his expert conclusions. How he states or repeats the interview will have to be controlled at the trial. Dr. Gorman should not be excluded since his testimony shall be limited to employment potential versus medical causation. As to how Dr. Gorman speaks or states his history or as to what adjective he uses, I cannot control that. I do know Dr. Gorman shall not state any medical causation conclusions. He shall only be offered for employment likelihood based upon conditions the plaintiff suffers from.

Dr. Gorman's report is attached as Exhibit "B". Based on Dr. Gorman's years of experience as a vocational counselor involved in employment opportunities for individuals, he should certainly be able to opine to a jury whether or not the jury could expect plaintiff to earn any income, and if so, how much. Defendant cites *Eugene v. Mormac Marine Transport, Inc.*, as support for its motion. Not only is this case without explanation, but Judge Livaudais never allows vocational experts to testify. The *Rutland* case is easily distinguishable and references alleged medical causation statements by Dr. Gorman that do not exist in this case. And, Dr. Gorman shall not state any medical causation opinions, nor will he be asked any. Dr. Gorman's report is simple and to the point, and his testimony shall assist the trier of fact in this case.

*Daubert* does not cause nor lead to the conclusion that Duffy and Gorman should be excluded. Defendant's motion should be denied.

7

Respectfully submitted,

DISCON LAW FIRM

BY: _____ .

THOMAS M. DISCON, T.A. #14219
JOHN G. DISCON, #4961
GREGORY T. DISCON, #22037
424 N. Causeway Blvd., Suite A
Mandeville, Louisiana   70448
Telephone: (985) 674-9748

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served on all counsel of

record by placing same in the United States Mail, properly addressed and postage prepaid, this

__30__ day of __May_____ , 2002.

_____ .

THOMAS M. DISCON

8

# GEORGE E. DUFFY

**ADDRESS:**    123 Villere Drive
Destrehan, LA   70047
(985) 764-8591

**PERSONAL INFORMATION:**   **MARRIED:**    Patricia Marsh Duffy
**CHILDREN:**    One

**EDUCATION:**    Loyola University - New Orleans
Bachelor of Business Administration 1969
Master of Business Administration 1971

<u>MASTER'S PROGRAM</u> - Harvard University School of Business 1976
School of International Business

<u>HONORS</u>
Alpha Sigma Nu - National Jesuit Honor Society
Cross Keys Evening Division National Honor Society

<u>AWARDS</u>
Louisiana Maritime Man of the Year - 1993
Alvin Bertel Port Award - 1992

<u>PROFESSIONAL COURSES</u>
<u>MARITIME CHARTERING COUNCIL</u> -    Vessel Chartering
Introduction Course Maritime Law
Intermediate Course Maritime Law
Advanced Course Maritime Law
Longshore & Harbor Workers Act
Lloyd's Admiralty Law Review
Vessel Management / Operations Jones Act
Oil Pollution Act 1990
Tanker Operations

<u>WORLD TRADE INSTITUTE</u>
Transportation Management I, II
Tanker Operations I, II
Admiralty Law I, II, III
Cargo Liabilities I, II
Personal Injuries
Longshoremen Harbor Workers Act
Tulane Law School Maritime Seminar & Law Review

<u>NATIONAL CARGO BUREAU</u>
National Cargo Bureau Grain Stability Course

l

EXHIBIT
_A_

PROFESSIONAL ASSOCIATIONS:   Association of Ship Brokers & Agents (USA) Inc.
   World Trade Club
   Philadelphia Maritime Society
   Philadelphia Marine Advisory Committee
   Baltimore Steamship Trade Association
   Hampton Roads Steamship Association
   Tampa Steamship Association
   Mobile Steamship Association
   New Orleans Steamship Association
   West Gulf Maritime Association
   Traffic & Transportation Club
   National Defense Transportation Association
   Propeller Club of the United States
   National Association of Stevedores
   Louisiana Maritime Council
   American Management Association
   New Orleans Board of Trade
   World Trade Center / Chamber of Commerce
   Traffic Club of Pittsburgh

APPOINTMENTS:   State of Louisiana Pilot Fee Commission 1987
   Associated Branch Pilots
   Crescent River Port Pilots Association
   New Orleans-Baton Pilots
   Chairman, Governor's Task Force on Maritime Industry -
   Appointed by the Governor of Louisiana Jan. 1992
   State of Pennsylvania Dredging Committee for the River Delaware -
   Appointed by the Governor of Pennsylvania 1984
   Chairman, United States Coast Guard Passenger Safety Committee

MILITARY SERVICE:  United States Air Force from September 1960 to September 1964

SUMMARY:   Ocean shipping executive with over 30 years experience in all aspects of the maritime industry. I have been responsible for the development of business operations, administration, chartering, stevedoring, vessel management and vessel operation, and marketing on a world wide basis. I have traveled extensively throughout the world and the inland and ocean ports of the United States. I was directly responsible for the development of terminal and stevedore operations in Iran, Kuwait, Saudi Arabia and other Middle East Nations and Far East areas as well as in the U.S. I have experience in maritime law related matters involving vessel Longshore harbor workers/Jones Act, and state compensation claims and awards. I am responsible for the management and development of marine insurance programs.

WORK EXPERIENCE:  September 1964 - May 1970

   I was employed with T. Smith & Son, a major general contracting stevedore company in the Port of New Orleans.
   Assistant Stevedore Superintendent, September 1964 - September 1965.
   Stevedore Superintendent, September 1965 - August 1967
   Assistant General Superintendent, August 1967 - August 1969
   Assistant to the President, August 1969 - May 1970

2

In the various capacities, I was directly responsible for the loading and unloading of ocean going vessels and barges with general, bulk, grain, steel and liquid cargoes. I directly supervised the loading and unloading of the ocean going vessels and barges. I specialized in heavy lift and project cargoes and traveled as required by our principals to ensure the proper handling and coordination of their cargo movements. I was responsible for preparation of time study reports, profit and loss statements. During this time, I worked in other company department derrick, mooring departments and safety department. I was responsible for stevedoring safety inspections on vessels, follow up with accident investigations, and coordinating with our insurance representative.

June 1970 - August 1980
Stevedore Manager - June 1970 - June 1971
General Manager - June 1971 - June 1973
Stevedoring & Operations Vice President June 1973 - August 1980

I was employed at Central Gulf Lines, Inc., an American Flag vessel owner and operator. In the various positions, I traveled throughout the U. S. ports as well as considerable travel to various ports around the world.

Central Gulf Lines, Vice President of Operations and Vice President of Mid Gulf Stevedores.

In this capacity, I was responsible for the management & operations of numerous general cargoes, lash, bulk carriers, RO-RO and tanker vessels in our worldwide operations. I traveled throughout Europe, the Middle East and Southeast Asia conducting operations in these various countries. In this capacity, I was responsible for all worldwide port operations, stevedoring contracts, agencies and operations for all our owned and chartered vessels. This included the coordination, pre-stow, and supervision of the loading of all vessels operated by our company. I was also responsible for our stevedoring company in the Ports of Galveston, Houston, Beaumont, New Orleans, Baton Rouge and Mobile. I set up stevedoring operations in various inland Ports in the United States and in various countries in the Middle East and Southeast Asia.

In addition to being Vice President for Central Gulf Lines and Mid Gulf Stevedores, I was also Executive Vice President for Bulk Stevedores Services, which was a grain stevedoring company which owned & operated floating grain elevators on the Mississippi River.

In addition to my operational duties on the stevedoring and vessels, I was also responsible for the operations of our baring department, which handled over 1500 barges per month on the inland waterways of the United States.

I was also responsible for the management of all marine and stevedoring insurance, and the administration of the marine insurance department, which handled world wide maritime claims. I was responsible for the establishment of the Central Gulf, Mid Gulf and Bulk Stevedoring Services Programs. Included in this was the on-board safety inspections and procedures to ensure compliance with the Longshore LSHWC Act on USCG and United States Coast Guard.

3

April 1981 to Present
Navios Ship Agencies Inc., President
Manager U. S. Gulf Agencies April 1981 - April 1982
General Manager April 1982 - December 1985
President December 1985 to present

I am responsible for the administrative, financial and operational activities of our agency network on the U. S. East Coast and the U. S. Gulf. In addition, I am responsible for the operational activities of our principals' vessels and coordination of specialty projects through the stevedoring activities. I am responsible for the operation, management and supervision of all Navios Ship Agencies Inc., stevedoring activities. I coordinate the development of business and am responsible for the marketing and expansion development of our agency network. I attend Port programs, activities, Federal and State legislation issues, which effect our company maritime interests. I provide maritime consultant activities for the development of terminal and cargo movements to represent the company in Port of origin to inland destinations. I am responsible for the handling of all maritime casualties and claims on behalf of our principals and through coordination and management of their assigned insurance clubs' legal representation.

Marine Consultant -
In addition to my responsibilities as President of Navios Ship Agencies Inc., I work independently as a Marine Consultant in many areas of the Maritime field. These include project developments on worldwide basis, port activities, special projects, terminal development, chartering issues and also work as an expert in Marine operations, stevedoring, vessel operations and USL&H claims.

I am also the Marine Consultant for United States Steel Corporation and United States Steel International. In this position, I am responsible for overseeing their ocean shipping, stevedoring, port and transportation infrastructure. I am also an advisor on chartering issues and have worked with them in office and terminal conditions within the U.S. Steel group. I am responsible for the approval of all vessels chartered to USSI and coordinate the loading operations for these vessels.

Chairman of the Governor's Task Force for the State of Louisiana.-
I was appointed in December of 1991 to work on Governor Edwards Transition Team to help advise on issues related to commerce and on the Louisiana port systems as related to foreign commerce in the State of Louisiana. Governor Edwards appointed me Chairman of the Governor's Task Force, which was one of the recommendations made to the Governor by the Maritime Transition Team. The Governor's Task Force has fifteen (15) members, composed of various entities involved in the Maritime business for the State of Louisiana, and include the Chairman of the Senate and the House Transportation Committee for the State of Louisiana. In the position of Chairman, I have been responsible for the development of the Maritime industry, improvement of the port facilities, river deepening projects, worldwide marketing of the Ports of Louisiana. I work with both Federal and Regulatory Agencies and with the Louisiana Congressional delegation in Washington on Maritime and other related issues. We have formed alliances with a national group of port representatives which have been very effective in dealing with Maritime issues in Washington. In this position, I have been an advisor to the Governor on Maritime issues involving Maritime and foreign commerce and the development of these for the State of Louisiana. I am also involved in the development of the gaming industry on the river

4

systems of Louisiana

**ACTIVITIES**

Louisiana Soccer Association - Lafreniere Soccer Committee
U.S. Soccer Association Certified Referee
U.S. Youth Soccer Association
U.S. National Coaches Association
Lafreniere Soccer Association
ST. Charles Parish Recreational Department
Baseball and Basketball Coach
Boys Scott of America Troop Committee

5

# GORMAN & GORMAN, INC.

704 MAIN STREET • MADISONVILLE, LOUISIANA  70447
Office (985) 845-4322 • Fax (985) 845-8722
Toll Free 888-893-3940
CORNELIUS E. GORMAN, PH.D.   REBECCA K. GORMAN, BCSW

April 23, 2002

Thomas M. Discon, Esq.                       <u>**VIA FACSIMILE ONLY**</u>
Discon Law Firm                                      (Fax:  674-9749)
424 N. Causeway Boulevard
Suite A
Mandeville, LA  70471

RE:   Ellis McClellan
     SSN:  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

     REHAB. CONSULT.:     PRIVATE AND CONFIDENTIAL - NOT FOR
                              RELEASE TO PATIENT OR FAMILY

Dear Mr. Discon:

Ellis McClellan was seen on April 15, 2002, for the purposes of vocational
rehabilitation evaluation, recommendations and report.


## REFERRAL INFORMATION

As Mr. McClellan got off the crane he was operating, he slipped in oil and fell,
striking his head, back and legs.  He was initially seen at the Marine Medical Unit
and low back sprain was diagnosed.  On February 10, 1999, he was seen by Dr. John
Watermeier.  He noted pain in the low back, groin, left lower extremity and neck,
headaches, dizziness, blurred vision, and bladder and sexual dysfunction.  He was
referred for urological evaluation.  Medication and physical therapy were prescribed.

He was next seen by Dr. Robert Steiner who noted multilevel disc degeneration,
spondylolysthesis, and possible lumbar strain.  Urological examination was performed
by Dr. Levine in mid 1999.  He prescribed medication and discharged Mr. McClellan
several months later.  Treatment continued with Dr. Watermeier every three months.



Thomas M. Discon, Esq.
April 23, 2002
Page 2


Because of persistent back pain, a trigger point injection was provided in October 1999. According to the patient, lumbar surgery has been discussed. In addition to his orthopedic treatment, he has been followed by several ophthalmologists for vision problems.

On April 14, 1999, Dr. Ellen Schneider reported that he is legally blind in both eyes and requested further testing. Dr. Robert Balkan examined him, in September 1999, and noted glaucomatous cupping in the left eye and central optic neuropathy in the right eye. On August 3, 2000, Dr. Joel Sacks examined Mr. McClellan. He reported a centrocecal scotoma in the right eye probably due to an old juxtapapillary choroiditis. In February 2001, Dr. Jonathan Calkwood saw him and agreed that his vision loss in the right eye was due to optic nerve damage, probably due to poor blood flow which could be secondary to an inflammatory problem or a spontaneous non-arteritic anterior ischemic optic neuropathy. Mr. McClellan has also been treated by Dr. Mahmoud Daftary for prostate cancer which is now in remission.


## INTAKE DATA

Ellis McClellan's home of record is 1373 Westlawn Drive, Slidell, Louisiana 70458, (985/646-2655). He is married for the second time. He has two children and three stepchildren. None of the children live at home. The patient was born December 10, 1936, and is now 65 years of age with height 6'1" and weight 200 pounds.

### History of Injury

Mr. McClellan was injured on the job on February 2, 1999.

### Surgery

He has not had surgery since the accident but lumbar surgery has been discussed. Because of his age and health situation, he has opted to postpone it as long as possible.

Thomas M. Discon, Esq.
April 23, 2002
Page 3


**Physicians**

Dr. Watermeier sees him every two to three months.

**Present Medication/Therapy**

Tylenol #3 is prescribed by Dr. Watermeier. He also takes a cholesterol lowering medication.

**Prior Medical History**

He reported no significant past medical problems.


## EDUCATION/TRAINING

| EDUCATION | |
|---|---|
| **Elementary:** Tylertown, MS | |
| **Secondary:** Hope Vocational High School, MS (graduated in 1956) | |
| **College:** | N/A |
| **Technical:** | N/A |
| **Licenses:** | N/A |
| **Military:** | N/A |


## WORK EXPERIENCE

While Mr. McClellan was a teenager, he worked as a farm laborer. After high school, he worked in building construction for several years. He worked in a grocery store as a clerk and bagger for one year and then as a produce truck delivery driver for several years. His next job was with Winn-Dixie as an order picker in a warehouse for three years. He became a longshoreman, in 1966, loading and unloading ships. He was

Thomas M. Discon, Esq.
April 23, 2002
Page 4

classified as a lift driver and a general longshoreman. He remained in the Union and became a crane operator in the early 1980's. He remained a crane operator until the accident in 1999, earning up to $24 per hour ($36 per hour overtime). He has not been able to work since the accident.

According to IRS records, he earned $79,034 in 1997 and $71,699 in 1998.

## PHYSICAL FUNCTIONING

Mr. McClellan right hand dominant. He states his disability correctly as orthopedic in nature.

### Present Diagnosis/Prognosis - From Records

- L5-S1 spondylolysthesis.
- Legally blind, both eyes.

### Symptoms - Subjective

1. Electric shock type pain in low back.
2. Left leg pain, numbness and weakness.
3. Stiffness of back and left leg.
4. Vision problems, glaucoma on left and undetermined problem on right.
5. Headaches.
6. Occasional ringing in left ear.
7. Sleep disruption with back pain.
8. Weather change increases pain in back and legs.
9. Left shoulder pain.

### Restrictions or Daily Limitations

He was advised to avoid heavy lifting, twisting, bending, and prolonged sitting and standing. He is very cautious when driving due to vision problems and numbness of the left leg. According to vocational testing by Dr. Larry Stokes in May 2001, Mr. McClellan has a Total Standard Score of 83 on the SIT-R. Grade equivalent scores on the Woodcock Johnson III were: Letter-Word Identification-8.0; Passage Comprehension-5.1; Math Fluency-4.7; and Reading Fluency-3.2.

Thomas M. Discon, Esq.
April 23, 2002
Page 5


**Other**

Mr. McClellan previously enjoyed maintaining his home and church.  He receives
$2,000 per month from his Union and $1,168 per month from Social Security.  His
wife does not work outside the home.  She had an aneurysm last year and had brain
surgery.


## ACADEMIC TESTING

The patient has been totally and permanently removed from all employment.
Assessment of academic talent would provide no benefit and the cost of that effort is
not justified.  Mr. McClellan has graduated from high school and presents as
acceptably literate given age, education and occupational experience.


## SOCIAL WORK/COUNSELING SERVICES

The patient has been disappointed by his loss of work and cannot return to gainful
activity.  His unhappiness was presented in an even-handed way.  Referral was not
recommended given this patient's circumstances.

**Motivation**

Mr. McClellan gave no indication of avoiding work.  His attitude and lifelong work
habits were excellent, per history.


## WORK CAPACITIES

**Work Capacity - Prior**

The patient last worked as a crane operator at $24 per hour and $36 per hour
overtime.  He cannot return to that occupation.  He reported that he was eligible, but
for his injury, to have continued despite his age.

Thomas M. Discon, Esq.
April 23, 2002
Page 6

The patient's job history, according to U.S. Department of Labor data, is as follows:

| OCCUPATION | DOT NUMBER | TITLE |
|------------|------------|-------|
| #1 | 911.663-014 | Stevedore I |
| #2 | 921.663-010 | Overhead Crane Operator |
| #3 | 421.687-010 | Farmworker, General II |
| #4 | 906.683-022 | Truck Driver, Light |
| #5 | 922.687-058 | Laborer, Stores |

**Work Capacity - Present/Future**

No future employment is anticipated as of this writing.

**Resource Data**

U.S. Department of Labor materials were utilized along with local wage and salary information. The reported wages were in keeping with that found.

## OCCUPATIONAL INTERESTS

Mr. McClellan would prefer employment as held in the past and as was available to him absent injury.

## VOCATIONAL DIAGNOSES

I.    Full and final occupational removal secondary to injury (1999).
II.   Normal vocational intellect.
III.  Adequate adult literacy.
IV.   Excellent work history.
V.    Excellent attitude.
VI.   Long term health related planning and budgeting recommended.

Thomas M. Discon, Esq.
April 23, 2002
Page 7


## SUMMARY

Mr. McClellan reported as scheduled. He made an excellent effort toward his evaluation. He was informative and explained his employment problems relative to having been hurt.

It is not possible to return this man to the former or alternative employment. In the event that additional information is needed, please advise.

This report was completed in accord with LSA R.S. 37:2701 et seq., LSA R.S. 37:2351 et seq., LSA R.S. 37:1101 et seq. and LSA R.S. 37:2706 et seq.

Thanking you for your attention to the above and with best wishes, I am

Sincerely,

Cornelius E. Gorman, Ph.D.
Rehabilitation Consultant
Psychiatric Social Worker

CEG/bb



# GORMAN & GORMAN, INC.

704 MAIN STREET • MADISONVILLE, LOUISIANA  70447
Office (985) 845-4322 • Fax (985) 845-8722
CORNELIUS E. GORMAN, PH.D.   REBECCA K. GORMAN, BCSW

## *VITAE*
## *DR. CORNELIUS E. GORMAN*

**EDUCATION**

| | |
|---|---|
| Ph.D. | University of Southern Mississippi, 1983 |
| | Graduate School of Education & Psychology |
| M.S.W. | Tulane University, 1974 |
| | Graduate School of Social Work |
| B.S.S | Loyola University, 1973 |
| | Undergraduate - Psychology |

**EMPLOYMENT**

| | |
|---|---|
| 1979-Present | Rehabilitation Consultant |
| | PRIVATE PRACTICE |
| 1978 - 1979 | Administrator |
| | AIRCO TECHNICAL INSTITUTE, New Orleans, LA |
| 1975 - 1978 | Chairman/Client Manager |
| | DELGADO COLLEGE VOCATIONAL REHAB. CENTER |
| 1975 - 1979 | Director Social Services |
| | MAGNOLIA HEALTH CENTER, New Orleans, LA |
| 1975 | Case Worker III |
| | DEPARTMENT OF WELFARE |

**MILITARY**   Commissioned: CAPTAIN, MSC, USAR, 1981-1986
Enlisted: Specialist 5, JAG, USAR, 1968-1975

**CERTIFICATION**

Licensed Clinical Social Worker - #1013
Certified Rehabilitation Counselor - #15368
Licensed Professional Rehab. Counselor - #182
Diplomate: American Board of Voc. Experts - #142425
Approved: Louisiana Dept. of Education
Approved: Law Enforcement Employment Examiner

Certified Vocational Evaluator - #698
Licensed Professional Counselor - #856
Certified Life Care Planner
Diplomate: Board of Social Work Examiners
Approved: Substance Abuse Provider
Commissioned: Police Officer

**MEMBERSHIPS**

National Rehabilitation Association
Louisiana Rehabilitation Association
National Rehabilitation Counseling Association
International Association of Rehabilitation Professionals
Chi Sigma Iota-#3456 & Phi Delta Kappa-#115412
Vietnam Veterans of America - VVOA #094103
American Counseling Association (ACA)
National Employment Counseling Association (NECA)
Assoc. for Counselor Education & Supervision (ACES)
American Board of Disability Analysts (ABDA) - #2354